IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Linda Ragin, : 
                 :
                 :
         Appellant : 
                 : No. 355 C.D. 2019
      v. : No. 513 C.D. 2019
                 :
Southeastern Pennsylvania : Argued: September 17, 2020
Transportation Authority : 


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                            FILED: July 14, 2021


       Linda Ragin (Appellant) appeals the orders of Judge Daniel J. Anders of the Philadelphia County Court of Common Pleas (trial court) dated February 25, 2019, and March 14, 2019, upholding a nonsuit granted in favor of Southeastern Pennsylvania Transportation Authority (SEPTA) and denying Appellant's request for a new trial. We affirm.

       On September 27, 2017, Appellant filed a complaint against SEPTA asserting negligence claims for injuries that she purportedly sustained on October 17, 2016, when she fell while riding on a SEPTA bus. She sought damages for her injuries, claiming that the bus driver's sudden acceleration of the vehicle caused her to fall. On July 6, 2018, following a hearing, an arbitration panel returned an award in SEPTA's favor. Appellant appealed the award to the trial court.

At the close of discovery, SEPTA filed a motion for summary judgment, which Judge Paula Patrick of the trial court denied. On February 19, 2019, a bench trial was held before Judge Anders. Appellant testified and offered the testimony of SEPTA bus driver David Chambers. She also submitted as exhibits a Medicare card, the video deposition of Dr. Maxwell Stepanuk, a medical report, photographs, and a SEPTA video of the relevant events, which showed interior views of the bus from the front door looking backward, the operator's point of view, overhead of the driver, and the middle of the vehicle.

Appellant identified herself in the video, and she answered questions related to portions of the video as they were played during her testimony. Appellant stated that she fell while she was trying to put her wallet away. "I see that he started to pull off right away. I tried to brace my back up against that pole because, like I said, he was going to pull away and I wasn't holding on. I was trying to put my – put my wallet or put my ID away." N.T.[1] at 21. Appellant stated that she was standing on the driver's side of the yellow line on the aisle of the bus when the bus accelerated. She said she tried but was not able to grab the pole. Appellant said she "fell like a tree. I fell extremely hard. I mean I just fell flat out." *Id.* at 23. Based on her prior experience, Appellant believed the bus accelerated faster than normal. *Id.* at 27-28. Appellant testified that she injured her back in the fall. She described her course of medical treatment and stated that she continues to have severe pain and difficulty walking and standing. *Id.* at 29-37.

On cross-examination, Appellant testified that at the time of the accident she was receiving disability benefits related to a brain aneurysm. She acknowledged that the Medicare card that she showed the bus driver did not indicate

---

[1] "N.T." refers to the transcript of the bench trial before Judge Anders.

2

that she was disabled. She agreed that she had no difficulty boarding the bus. She said she would have had difficulty boarding if the bus had not been lowered. She believed that the driver lowered it for her, although she did not ask him to do so. N.T. at 38-40.

Appellant testified that after she showed the bus driver her Medicare card she stopped at the yellow line. She said that she could not have continued walking to her seat because the driver started to pull off and she was not holding on. When asked if she knew that the bus was going to move, Appellant said that she believed that the driver was going to give her a chance to get to a seat, but she agreed that she saw the front doors close. N.T. at 40-41.

Chambers testified that he had little memory of the incident, and he likewise referenced the video during his testimony. N.T. at 49. He was not sure whether federal regulations allowed him to operate the bus if a passenger was in front of or partially in front of the yellow line. *Id.* at 47. Chambers agreed that a sign at the front of the bus said, "Please stand behind the yellow line." *Id.* at 51. Appellant's counsel read the following language: "Every bus shall have clearly posted at or near the front a sign with the letters at least one half inch high stating that it is a violation of the Federal Motor Carrier Safety Administration's Regulations for a bus to be operated with persons occupying the prohibited area [in front of the yellow line]," *id.* at 67, after which Chambers acknowledged that Appellant was at least partially occupying the prohibited area when he accelerated. *Id.*

Chambers stated that if a passenger showed him a Medicare card, he would assume that he or she was either disabled or age 65 or older. N.T. at 48. He testified that if passengers have a disability or a mobility issue, he gives them extra

3

time to get seated, and he agreed that passengers over 65 often need a little more time to board the bus than passengers younger than 65 need. *Id*. at 49.

Chambers acknowledged the provisions in a SEPTA Instruction Book for Operators directing drivers to "press the pedal slowly and evenly until the desired speed is reached." N.T. at 52. Appellant attempted to introduce Chambers' SEPTA safety record into evidence, but the trial court sustained SEPTA's objection. The trial court rejected Appellant's argument that the operator's driving record was relevant to a claim of negligent entrustment of the bus and agreed that such a claim does not fall within the exceptions to sovereign immunity. *Id*. at 54-61.

Chambers testified that he had no independent recollection of whether Appellant was behind the yellow line when he accelerated the bus. He acknowledged that the video showed Appellant's foot on the yellow line when the bus started moving. N.T. at 61-63. Chambers understood that the purpose of the yellow line is to allow passengers to stand while ensuring that the driver's field of vision is not obstructed. He said that before he started off, he noted that Appellant was standing and that she was not obstructing his view. Chambers said he is not required to wait until passengers are seated before he proceeds from a stop unless they display a physical impairment or make a verbal request. He testified that there was nothing about Appellant indicating she was disabled and that she did not inform him she was disabled or ask for additional time to get seated. *Id*. at 64-65. Chambers said that he lowered the bus as soon as he curbed the vehicle and that a passenger was getting off the bus at that time. *Id*. at 64.

4

At the close of Appellant's case, SEPTA interposed a motion for a compulsory nonsuit[2] based on the "jerk and jolt doctrine." Appellant objected to SEPTA's reliance on portions of the video that Appellant had not played, arguing that SEPTA should not be permitted to show evidence in support of its motion. The trial court noted that Appellant had not objected to the admission of the video in its entirety (Appellant's Exhibit P-1) and allowed SEPTA to play additional portions of the video.

During argument on the motion, SEPTA asserted that Appellant did not meet her burden under the jerk and jolt doctrine. Specifically, SEPTA asserted that the video corroborated Chambers' testimony and showed that Appellant chose to stand, while she had five to six seconds when she could have proceeded to a seat. SEPTA argued that the narrow exception to the jerk and jolt doctrine, applicable where a passenger has an obvious physical or mental disability, did not apply.

In response, Appellant argued that SEPTA has a duty to use the highest level of care when it knows or should know that a passenger has a mental or physical disability. Appellant insisted that the mere fact of Appellant's age, as evidenced by her Medicare card, was sufficient to establish her disability. N.T. at 81.

The trial court rejected this argument. The trial court also rejected Appellant's contentions that SEPTA's alleged violation of federal regulations was proof of negligence and that the denial of summary judgment precluded nonsuit

---

[2] Pursuant to Pa. R.C.P. No. 230.1(a), "in an action involving only one plaintiff and one defendant, the court, on oral motion of the defendant, may enter a nonsuit on any and all causes of action if, at the close of the plaintiff's case on liability, the plaintiff has failed to establish a right to relief." *Id.* In deciding the motion, the court "shall consider only evidence which was introduced by the plaintiff and any evidence favorable to the plaintiff introduced by the defendant prior to the close of the plaintiff's case." *Id.*

under the law of the case doctrine.  At the conclusion of argument, the trial court granted SEPTA's motion for nonsuit.  Appellant then filed the instant appeals.[3]

## I.

We initially observe that an order denying a motion to remove a compulsory nonsuit will be reversed on appeal only for an abuse of discretion or an error of law.  *Alfonsi v. Huntington Hospital, Inc.*, 798 A.2d 216, 218 (Pa. Super. 2002).  A nonsuit is properly entered only if, when viewing the evidence in the plaintiff's favor, no reasonable factfinder could find that the plaintiff has introduced sufficient evidence to establish the essential elements of her claim.  *Biddle v. Johnsonbaugh*, 664 A.2d 159, 161 (Pa. Super. 1995).

As this Court has explained:

> [I]n reviewing a compulsory nonsuit, the plaintiffs are to be given the benefit of all favorable testimony and every favorable inference of fact arising therefrom; and all conflicts in the evidence are to be resolved in the plaintiffs' favor.  A compulsory nonsuit should be upheld only where it is inconceivable, on any reasonable hypothesis, that a mind desiring solely to reach a just and proper conclusion in accordance with the relevant governing principles of law, after viewing the evidence in a light most favorable to the plaintiff, could determine the controlling issue in plaintiff's favor.

---

[3] Appellant filed a timely motion for post-trial relief seeking removal of the nonsuit and a new trial.  By order dated February 25, 2019, the trial court denied the motion, but indicated in the order that the nonsuit had been removed.  Appellant filed a praecipe for entry of judgment on February 27, 2019, and she filed a notice of appeal to this Court, docketed at No. 355 C.D. 2019, on February 28, 2019.  Appellant filed a timely Pa. R.A.P. 1925(b) statement of errors complained of on appeal.  On March 14, 2019, the trial court issued an amended order denying removal of the nonsuit and Appellant's request for a new trial.  Judgment on the amended order was entered on April 2, 2019, and Appellant filed a timely appeal.  The second appeal was docketed at No. 513 C.D. 2019.  This Court's September 19, 2019 order consolidated the appeals.

*Stevens v. Department of Transportation*, 492 A.2d 490, 492 (Pa. Cmwlth. 1985) (citations omitted).

## II.

In this appeal,[4] Appellant first claims that her testimony and the video are sufficient to show the effect of the accident upon her, which inherently establishes the unusual character of the jolt or jerk. She argues that when this evidence is viewed in her favor, a reasonable factfinder could determine that her evidence establishes that the effect of the acceleration on Appellant was of unusual character. Additionally, relying on *LeGrand v. Lincoln Lines, Inc.*, 384 A.2d 955 (Pa. Super. 1978), Appellant argues that the trial court ignored the elevated standard of care owed for passengers who the driver has reason to know "are elderly and/or disabled." Brief of Appellant at 18. Appellant asserts that the trial court failed to "take the age and physical limitations of [Appellant], an elderly and disabled woman, into proper account." *Id.*

However, we have observed that the "jerk and jolt test is difficult to meet." *Martin v. Southeastern Pennsylvania Transportation Authority*, 52 A.3d 385, 390 (Pa. Cmwlth. 2012). In opposing a motion for compulsory nonsuit, the plaintiff in *Meussner v. Port Authority of Allegheny County*, 745 A.2d 719, 721 (Pa. Cmwlth. 2000), testified that, after his wife signaled for a stop, and as he was walking toward the front of the bus, the driver applied the brakes and he went "flying forward." He insisted that this testimony was sufficient to get the case to a jury. However, we explained in *Meussner* that our Supreme Court "has established a rather stringent standard for what constitutes a prima facie case" under the jerk and jolt doctrine. *Id.*

---

[4] In the interest of clarity, we consolidate the first two allegations of error that Appellant raises on appeal.

As recognized in *Connolly v. Philadelphia Transportation Company*, 216 A.2d 60, 62-63 (Pa. 1966), a plaintiff may establish that a jerk or stop was unusual and extraordinary by showing either: (1) the stop had an extraordinary disturbing effect on other passengers; or (2) the manner of the occurrence of an accident or the effect of which upon the plaintiff inherently establishes the unusual character of the jolt and jerk. In *Meussner*, we repeated the oft-cited observation that it is not unusual for persons to lose their balance while standing or walking in a car if an ordinary or moderate jerk occurs. *Id.* at 723 (citing *Smith v. Pittsburgh Railways Co.*, 171 A. 879, 880 (Pa. 1934)).

In *Jackson v. Port Authority of Allegheny County*, 17 A.3d 966, 968 (Pa. Cmwlth. 2011), the plaintiff testified that she had pulled the bell to signal a stop, got up, and was paying her fare, when the driver drove past her bus stop and then "stomped on the brakes," causing her to fall forward and suffer a broken kneecap. The plaintiff testified that she also slipped on ketchup and water that had been spilled by other passengers who recently exited. The plaintiff's granddaughter was travelling with her and confirmed her grandmother's testimony. The granddaughter was holding onto bars on the side of the bus and did not fall. We concluded that summary judgment was properly granted to the Port Authority of Allegheny County because the facts were nearly indistinguishable from those in *Meussner*.

Additionally, we rejected the plaintiff's contention that under *Connolly*, the trial court should have permitted the negligence of the driver to be considered independently from the jerk and jolt doctrine. We clarified that the Supreme Court in *Connolly* "*did not view the negligence of the bus driver as separate and unrelated*" to the jerk and jolt doctrine. *Jackson*, 17 A.3d at 971 (emphasis added). We acknowledged the Court's statement in *Connolly* that "the basis for an unusual

or extraordinary stop by a bus resulting in injury to a passenger calls for some explanation on the part of the common carrier," 216 A.2d at 62, but we stated that before an explanation for a stop is required, there must first be proof of an "unusual or extraordinary" stop. *Jackson*, 17 A.3d at 971.

In *Martin*, the plaintiff boarded a SEPTA bus and was walking down the aisle when the bus suddenly accelerated and then stopped, causing her to fall and sustain injuries to her head, neck, and back. An arbitration panel awarded the plaintiff $20,000, and she appealed. Following discovery, SEPTA filed a motion for summary judgment, asserting that the plaintiff's testimony was insufficient, under the jerk and jolt doctrine, to establish that the movement of the bus was so unusual or so extraordinary as to exceed a passenger's reasonable expectation. SEPTA also noted there was no evidence that the movement of the bus disturbed any other passengers. The trial court granted the motion. This Court affirmed on appeal, agreeing that whether the plaintiff's fall occurred after an acceleration or a stop was not dispositive, and that the jerk and jolt doctrine applies to sudden stops. *Id.* at 391. Further, we agreed that the plaintiff's testimony was not sufficient to meet her burden, where the plaintiff did not know how fast the bus was going or whether she was holding onto anything while she walked. Citing *Meussner*, we again explained, "[I]t is not unusual for a person to lose his or her balance while standing or walking on a bus if an ordinary or moderate jerk occurs." *Id.*

The passenger in *Bost-Pearson v. Southeastern Pennsylvania Transportation Authority*, 118 A.3d 472, 473 (Pa. Cmwlth. 2015), was seated about six rows behind the driver when, she alleged, the driver "suddenly and without warning . . . negligently and carelessly operated its motor vehicle." We stated that a passenger's description of the driver's actions as "abrupt," "a sudden jerk," or an

9

"unusual jerk," or the statement that the action "threw [her] violently on the floor," "is insufficient, in and of itself, to establish negligence." *Id.* at 475. We explained that "if every person thrown and injured in a streetcar could recover damages on proof merely that he was 'violently' thrown the resulting burden on the carrier would be unbearable." *Id.* (quotation, citation, and emphasis omitted).

We addressed Appellant's additional argument, that the driver owed her a heightened duty of care, in *Asbury v. Port Authority of Allegheny County*, 863 A.2d 84 (Pa. Cmwlth. 2004). The plaintiff in *Asbury* was 34 weeks pregnant. She boarded a bus carrying a purse and a knapsack. She did not speak to the driver, but walked to the first seat facing the front of the bus, put down her bags, and was in the process of sitting down when the bus lurched. The plaintiff tried to grab a bar but failed, and she fell, breaking her femur. The plaintiff did not know whether any other passengers had been affected by the sudden lurch of the bus. She also testified that the coat she was wearing at the time might have concealed her pregnancy. At the conclusion of the plaintiff's case, the trial court granted the Port Authority of Allegheny County's (PAT) motion for nonsuit. This Court affirmed on appeal.

Relevant here, in *Asbury*, we agreed with the trial court's determination that *LeGrand* was not controlling, explaining:

> The plaintiff in *LeGrand* was a seventy-year-old woman who was partially blind, wore an eye patch and boarded the bus carrying a suitcase and purse. Not only was she obviously handicapped, but the bus driver apparently accelerated immediately after the woman boarded the bus while she attempted to show the bus driver her Medicare and Social Security cards. The Superior Court stated [that] it viewed the following legal principle as controlling: "[A] carrier which accepts as a passenger a person known to be affected by either a physical or mental disability which increased the hazards of travel must

10

exercise a greater degree of care for that passenger than is ordinarily required." *LeGrand*, 384 A.2d at 956.

Even though the standard and scope of review requires us to consider the evidence and testimony most favorable to [the plaintiff], this Court cannot conclude, based upon the evidence presented in the record, that PAT's driver owed [the plaintiff] a heightened degree of care. The difference between the passenger in *LeGrand* and [the plaintiff] is that [the plaintiff] and the bus driver testified that, when [the plaintiff] entered the bus, she did not have any problem ascending the stairs or proceeding down the aisle, that [the plaintiff] may not have appeared pregnant through her heavy coat, that she was carrying a considerable amount of baggage and that she did not request that the driver wait until she was seated before proceeding. On these facts, the trial court did not err in determining that the driver did not breach any duty of care by starting the bus before [the plaintiff] was seated.

*Asbury*, 863 A.2d at 88 (footnote and internal citation omitted).

In the Pa. R.A.P. 1925(a) opinion filed in support of its orders, the trial court recounted the following relevant facts underlying Appellant's claim for damages:

On October 16, 2016, [Appellant] boarded a SEPTA bus at the intersection of Stenton and Mt. Pleasant Avenue in Philadelphia, Pennsylvania. Although she was carrying a purse and another bag under her arm, [Appellant] had no problem boarding the bus. When she boarded the bus, [Appellant] showed her Medicare card to the driver. After waiting five seconds, the SEPTA driver closed the front doors of the bus and slowly drove it forward. As the bus moved forward, [Appellant] fell. At the time the bus moved forward, [Appellant] was not holding onto anything because she was putting her wallet into her purse. Also, [Appellant] was standing on a yellow line near the front of the bus when the bus moved forward. [Appellant] admitted that she did not have any conversation with the SEPTA driver when she boarded the bus. She also admitted that she did not tell the SEPTA

11

driver that she was disabled or needed additional time to take a seat. [N.T.] at 17-22, 25, 39-41, 61-65.

At the time of her injury, [Appellant] was 68 years old and retired from her last employment due to a disability related to a brain aneurysm. *Id.* at 16; 38.

Trial Court Op. at 1-2.[5]

With respect to the application of the jerk and jolt doctrine, the trial court explained:

> Here, as in *Asbury*, the trial court properly found that [Appellant] could not make out a *prima facie* case for negligence under the [jerk and jolt d]octrine. The SEPTA bus's movement was – at most – a moderate or ordinary jerk that was well within a passenger's reasonable expectation. The SEPTA bus's forward movement also had a usual and ordinary effect on [Appellant], *i.e.*, the movement caused her to fall. It was predictable that [Appellant] would likely fall because she was not holding onto anything to stabilize herself when the bus moved forward. Under these facts, like in *Asbury*, the moderate or ordinary forward movement of the SEPTA bus had a usual and ordinary effect on [Appellant], *i.e.*, she fell, an effect that is well within the reasonable expectation of a passenger.

> At trial, [Appellant] testified that she fell "really hard" like a "tree." N.T. [at] 22, 28:13-28. This testimony is insufficient to sustain her burden of proof. For example, the Commonwealth Court held that testimony that simply states, in descriptive language, that the bus jerked suddenly, unusually, or that "it threw [her] violently to the floor" is insufficient by itself to establish negligence. *Bost-Pearson*, 118 A.3d at 475. Moreover, the surveillance video confirmed that the SEPTA bus's forward movement from the bus stop was not so unusual

---

[5] On appeal, this Court may not reweigh the evidence or substitute our own judgment for that of the trial court as the factfinder. *Swift v. Department of Transportation*, 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007).

and extraordinary as to be beyond a passenger's reasonable expectation.

*Id.* at 5 (footnote omitted).

Finally, with respect to Appellant's purported disability and the application of *LeGrand*, the trial court observed:

> [T]he trial court properly found that the fact that [Appellant] was 68 years old at the time of the accident is not – without more – evidence of a physical or mental disability that increased the hazards of travel. Also, [Appellant] conceded that she did not identify herself to the SEPTA bus driver as disabled or needing any additional time to take a seat. Similarly, [Appellant's] Medicare card did not identify her as disabled. Although [Appellant] was on disability as a result of being diagnosed with a brain aneurysm, [Appellant's] attorney conceded during closing argument that the aneurysm diagnosis was not a basis to apply the *LeGrand* exception. N.T. [at] 80-84.

*Id.* at 6-7.

Based on the foregoing, in this case, there is ample competent evidence supporting the trial court's determination that Appellant failed to make out a *prima facie* case of negligence under the jerk and jolt doctrine to support the award of damages due to the absence of evidence of an unusual or extraordinary movement of the bus so as to exceed her ordinary expectations. Appellant likewise demonstrated no difficulty boarding the bus, she had no evident disability, and she did not communicate a disability or a request for accommodation to the driver. Nevertheless, Appellant argues that her situation is "nearly identical" to the plaintiff's situation in *LeGrand*. Brief of Appellant at 19. Appellant's contention that attaining the age of 65 or over constitutes a disability is unsupported by law or fact. In sum, as outlined above, the trial court did not err in granting a nonsuit and Appellant's allegations of error in this regard are without merit.

13

**III.**

Appellant next argues, in a conclusory fashion, that the trial court erred in granting a nonsuit because SEPTA is negligent *per se* based on the bus driver's violation of Section 393.90 of the Federal Motor Carrier Safety Regulations (FMCSR) of the Federal Highway Administration of the United States Department of Transportation, 49 C.F.R. §393.90.[6] Again, we do not agree.

In order to prove a claim based on negligence *per se*, a plaintiff must meet these four requirements: (1) the purpose of the statute must be, at least in part, to protect the interest of individuals as opposed to the public in general; (2) the statute or regulation must clearly apply to the conduct of the defendant; (3) the defendant must violate the statute or regulation; and (4) the violation of the statute or regulation must be the proximate cause of the plaintiff's injuries. *Schemberg v. Smicherko*, 85 A.3d 1071, 1073-74 (Pa. Super. 2014).

---

[6] Section 393.90 of the FMCSR states:

> Except as provided below, every bus, which is designed and constructed so as to allow standees, shall be plainly marked with a line of contrasting color at least 2 inches wide or equipped with some other means so as to indicate to any person that he/she is prohibited from occupying a space forward of a perpendicular plane drawn through the rear of the driver's seat and perpendicular to the longitudinal axis of the bus. Every bus shall have clearly posted at or near the front, a sign with letters at least one-half inch high stating that it is a violation of the Federal Motor Carrier Safety Administration's regulations for a bus to be operated with persons occupying the prohibited area. The requirements of this section shall not apply to any bus being transported in driveaway-towaway operation or to any level of the bus other that the level in which the driver is located nor shall they be construed to prohibit any seated person from occupying permanent seats located in the prohibited area provided such seats are so located that persons sitting therein will not interfere with the driver's safe operation of the bus.

14

Appellant alleged in her complaint that the sudden acceleration of the bus caused her to fall. As stated above, we have held that the alleged negligence of the bus driver is not a consideration that is separate and unrelated to the jerk and jolt doctrine. *Jackson*, 17 A.3d at 971.

Moreover, as acknowledged by Appellant's counsel, the purpose of the foregoing federal regulation is to ensure that the driver has a clear view before operating the vehicle, and not to ensure that passengers are sufficiently past the driver to take their seat on the bus. As a federal district court has likewise observed:

> Plaintiffs' negligence *per se* claim is based on an assertion that [the driver] violated 49 C.F.R. §393.90 when he operated the bus with [the injured passenger] seated on the top step next to him. However, contrary to Plaintiffs' assertion, [Section] 393.90 does not prohibit a driver's operation of a bus when a passenger is in front of the so-called "white line" but, rather, merely mandates the posting of a cautionary sign on the bus. *See* 49 C.F.R. §393.90 ("Every bus shall have clearly posted at or near the front, a sign . . . stating that it is a violation . . . for a bus to be operated with persons occupying the prohibited area.").

*Ladenheim v. Starr Transit Company, Inc.*, 242 F. Supp. 3d 395, 406 n.3 (E.D. Pa. 2017). *See also* Section 392.62(a) of the FMCSR, 49 C.F.R. §392.62(a) ("No person shall drive a bus and a motor carrier shall not require or permit a person to drive a bus unless . . . [a]ll standees on the bus are rearward of the standee line or other means prescribed in [Section] 393.90 of this subchapter."); *Ladenheim*, 242 F. Supp. 3d at 406 n.3 ("[T]he regulation that addresses the actual operation of a bus while a passenger is located near the driver, states that '[n]o person shall drive a bus . . . unless . . . [a]ll <u>standees</u> on the bus are rearward of the <u>standee</u> line or other means prescribed in [Section] 393.90 of this subchapter.' 49 C.F.R. §392.62 (emphases added).").

Furthermore, and quite importantly, Appellant does not direct this Court to any evidence that the purported violation of the foregoing federal regulation was the proximate cause of Appellant's injuries. Consequently, Appellant's argument in this regard is without merit as well.

## IV.

Finally, Appellant argues that the trial court's grant of a nonsuit violated the law of the case doctrine based on Judge Patrick's prior order denying summary judgment "with prejudice." Reproduced Record at 301. Appellant asserts that she and Chambers testified in a similar manner as they did in their respective depositions, and both judges viewed the video so that the prior ruling with respect to summary judgment precludes the instant ruling regarding Judge Anders' entry of a nonsuit.

The law of the case doctrine, or the coordinate jurisdiction rule, "refers to the long-recognized principle that judges of coordinate jurisdiction sitting in the same case should not overrule each other's decisions." *Lock v. City of Philadelphia*, 895 A.2d 660, 668 (Pa. Cmwlth. 2006). However, the coordinate jurisdiction rule does not apply where the motions are of a different type. *Hunter v. City of Philadelphia*, 80 A.3d 533, 536 (Pa. Cmwlth. 2013). *See also Neidert v. Charlie*, 143 A.3d 384, 391 (Pa. Super. 2016) (where a transferor trial judge has ruled on a prior motion for summary judgment, the coordinate jurisdiction rule does not apply to a transferee trial judge's subsequent ruling on a motion for compulsory nonsuit raised at trial).

As this Court has explained:

> [M]otions for summary judgment and for entry of a nonsuit differ not only in kind but also in the operative

16

facts. Summary judgment is appropriately granted where the record shows that there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law, and the right to such judgment is clear and free from doubt. [*Martin*]. Entry of nonsuit is proper only if the fact finder, viewing all the evidence in favor of the burdened party, could not reasonably conclude the essential elements of the cause of action were established and can only be granted in cases where it is clear a cause of action was not established. *Daddona v. Thind*, 891 A.2d 786 (Pa. Cmwlth. [2006]).

*Hunter*, 80 A.3d at 537. As with the preceding issues, Appellant's argument in this regard is not supported by, or consistent with, the relevant controlling authority.

Accordingly, the trial court's orders are affirmed.

 

MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Linda Ragin,                              :
                                          :
                    Appellant             :
                                          :
          v.                              : No. 355 C.D. 2019
                                          : No. 513 C.D. 2019
Southeastern Pennsylvania                 :
Transportation Authority                  :

# **O R D E R**

AND NOW, this 14<u>th</u> day of <u>July</u>, 2021, the orders of the Philadelphia County Court of Common Pleas dated February 25, 2019, and March 14, 2019, are AFFIRMED.


_____
MICHAEL H. WOJCIK, Judge