# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Darnell Grinnage                :
:
         v.              :    No. 1046 C.D. 2023
:
Southeastern Pennsylvania      :
Transportation Authority and     :
John Doe/Jane Doe (SEPTA Driver) :
:
Appeal of: Southeastern Pennsylvania :
Transportation Authority      :    Argued: December 9, 2024


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MATTHEW S. WOLF, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                        FILED: August 8, 2025

Southeastern Pennsylvania Transportation Authority (SEPTA) appeals an order of the Court of Common Pleas of Philadelphia County (trial court) that denied SEPTA's motion for post-trial relief seeking entry of judgment notwithstanding the verdict (JNOV).[1] This case stems from an incident where Darnell Grinnage, an unsupported standing passenger on a SEPTA bus, sustained an injury to his left bicep when he fell as the bus accelerated. Concluding that the evidence of record definitively shows that Grinnage cannot overcome the "jerk and

---

[1] The trial court denied SEPTA's motion seeking JNOV by order dated July 20, 2023. Notice of Appeal at 8 (electronic pagination). The trial court entered judgment in favor of Darnell Grinnage on September 13, 2023, and SEPTA filed a timely appeal. *Id.* at 37.

jolt doctrine" defense to a claim of negligence against a common carrier, we reverse the trial court's entry of judgment and remand to the trial court to grant SEPTA's motion for post-trial relief requesting JNOV.

On the morning of May 15, 2019, Grinnage boarded a SEPTA bus and paid his fare. He proceeded to a seat but remained standing when the bus accelerated. Upon the acceleration, Grinnage reached for the upper handrail with his left arm to prevent losing his balance. This movement resulted in Grinnage sustaining an injury to his left bicep. Grinnage subsequently filed a negligence complaint against SEPTA seeking damages for his injury. Following the completion of discovery, SEPTA filed a motion for summary judgment on the basis that Grinnage could not overcome the "jerk and jolt" doctrine defense to a claim of negligence against SEPTA. Original Record (O.R.) Item No. 27. By order dated August 14, 2022, the trial court denied SEPTA's motion for summary judgment and the case proceeded to a two-day jury trial. *Id.*, Item No. 36.

Before the jury, Grinnage testified and presented the testimony of Donnie Jones, a video analyst for SEPTA, Calvin Taylor, the bus driver, and Dr. Jack Shilling, a board-certified orthopedic surgeon. When Grinnage rested his case, SEPTA moved for a directed verdict/entry of non-suit, again on the basis of the jerk and jolt doctrine, which the trial court denied. SEPTA proceeded with its defense, offering a surveillance video of the incident and calling Jones, Taylor, and Grinnage to testify. At the close of trial, SEPTA moved for a directed verdict/entry of non-suit, which was yet again denied. Ultimately, the jury returned a verdict in the amount of $200,000.00, finding SEPTA 55% negligent, and Grinnage 45% negligent. Accordingly, the verdict was molded in Grinnage's favor to $121,921.97. SEPTA sought post-trial relief requesting JNOV, which the trial Court also denied.

2

In its accompanying opinion, the trial court explained that SEPTA's jerk and jolt doctrine defense relied heavily on the video evidence of the incident, which SEPTA argued was conclusive. The trial court disagreed with SEPTA's position, explaining that the time/speed counter on the video was not fully functioning, which "removed an objective basis for judging the speed at which the bus was traveling moments before and after the relevant events and preventing the court and the jury from conclusively agreeing with SEPTA that the movement [of the bus] was not excessive." Reproduced Record (R.R.) 480a.

Discussing additional evidence presented to the jury, the trial court stated that

> SEPTA also ignores that the testimony of the driver, in conjunction with the video, was also seriously undermined on cross-examination. During the examination [the driver was] forced to admit that he was driving at times without his hands on the wheel and, immediately before [Grinnage] lost his balance, the driver is seen making a hard turn to the left which jerked the bus into traffic while accelerating, a combination that showed numerous passengers beside [Grinnage] reacting on the video. The principal basis for SEPTA's argument was a video that showed not only [Grinnage], but several passengers on the bus reacting to the way the driver accelerated from the bus stop, a piece of evidence in no way conclusive or determinative and a matter subject to the interpretation of the trier of fact.

> The jury considering all the evidence presented at trial rejected SEPTA's position that the person affected by the movement was [Grinnage]. The video plainly showed that even the passengers had difficulty maintaining their position when the vehicle made a hard turn into traffic, lurched and visibly sped away from the stop. The speed/time counter on the video was stuck on one number and could not show the speed, a fact, along with the

3

driver's compromised testimony, that the jury could consider in making its determination.

*Id.* at 480-81.

SEPTA appeals the trial court's denial of JNOV to this Court, maintaining that Grinnage failed to present sufficient evidence to overcome the jerk and jolt doctrine defense.[2]

We begin with a review of Pennsylvania's longstanding jerk and jolt doctrine. *See Jennings v. Union Traction Co.*, 55 A. 765 (Pa. 1903) (doctrine originating back to 1903). In this Commonwealth, to succeed in a negligence action against a common carrier, a plaintiff must establish that the jerk or jolt of the bus was so unusual or extraordinary as to be beyond his or her reasonable anticipation by demonstrating: (1) that the stop has an extraordinarily disturbing effect on other passengers; or (2) evidence of an accident, the manner of the occurrence of which or

---

[2] Our Supreme Court has explained:

An appellate court will reverse the trial court's decision to grant or deny JNOV only when it finds an abuse of discretion or an error of law. *See Rost v. Ford Motor Company*, [] 151 A.3d 1032, 1042 ([Pa.] 2016) (citing *Reott* [*v. Asia Trend, Inc.*, 55 A.3d 1088, 1093 (Pa. 2012)]). In reviewing the lower court's decision, we must read the record in the light most favorable to the verdict winner and afford her the benefit of all reasonable inferences. *Moure v. Raeuchle*, [] 604 A.2d 1003, 1007 ([Pa.] 1992). Our scope of review is plenary. *Reott*, 55 A.3d at 1093.

A court may enter JNOV on one of two bases. The first is where a movant is entitled to judgment as a matter of law because, upon reviewing the record and deciding all factual inferences adverse to the movant, the law nonetheless requires a verdict in his favor. *Moure*, 604 A.2d at 1007. The second is where "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Id.*; *see also Birth Center* [*v. St. Paul Companies, Inc.*, 787 A.2d 376, 384 (Pa. 2001)]. In such a case, the court reviews the evidentiary record and concludes based on the evidence that a verdict for the movant was beyond peradventure. *Moure*, 604 A.2d at 1007.

*Justice v. Lombardo*, 208 A.3d 1057, 1069 (Pa. 2019).

the effect of which upon the injured person inherently establishes the unusual character of the jerk or jolt. *Connolly v. Phila. Transp. Co.*, 216 A.2d 60, 64 (Pa. 1966). In *Connolly*, the Supreme Court elaborated on the type of evidence sufficient (and insufficient) to establish a negligence claim in jerk and jolt cases. The *Connolly* Court stated:

> It is well established by a long line of decisions that testimony indicating that a moving trolley car jerked suddenly or violently is not sufficient, of itself, to establish negligence in its operation. There must be a showing of additional facts and circumstances from which it clearly appears that the movement of the car was so unusual and extraordinary as to be beyond a passenger's reasonable anticipation, and nothing short of evidence that the allegedly unusual movement had an extraordinarily disturbing effect upon other passengers, or evidence of an accident, the manner of the occurrence of which or the effect of which upon the injured person inherently establishes the unusual character of the jolt or jerk, will suffice.

*Connolly*, 216 A.2d at 62 (*quoting Staller v. Phila. Rapid Transit Co.*, 14 A.2d 289, 291 (Pa. 1940)). In summarizing cases throughout the last century, this Court has concluded that "the jerk and jolt test is difficult to meet." *Martin v. Se. Pa. Transp. Auth.*, 52 A.3d 385, 390 (Pa. Cmwlth. 2012). With this legal standard in mind, we turn to the parties' arguments on appeal.

SEPTA maintains that Grinnage did not present sufficient evidence to establish that the jerk or jolt of the bus was so unusual or extraordinary as to be beyond his reasonable anticipation, and that the video evidence of the incident does not show a disturbing effect on other passengers, or an accident that would inherently establish the bus's unusual movement. Following a careful review of the evidence, we agree with SEPTA.

The video surveillance evidence offered by SEPTA includes nine screens: one depicting a map of the bus's location, two showing exterior views, one depicting the bus driver from above, and the remainder depicting various angles of the interior of the bus. The relevant portion of the video begins at the 8:34 minute mark, when Mr. Grinnage boards the bus and pays his fare. After paying, he walks towards an open seat with his hand on the upper handrail. Although the seat is open, Mr. Grinnage remains standing and appears to be trying to put something in his pocket. Another passenger boards after Mr. Grinnage, and the bus begins to move while that passenger is paying his fare. As the bus accelerates, Mr. Grinnage makes no effort to secure himself or sit down. He does not protect himself at all against the natural movement of the bus. Instead, he is standing and moving his hands around his body. At the 8:50 mark, the video shows Grinnage beginning to fall while still unsupported and grabbing the upper handrail with his left arm to prevent himself from losing his balance.

Importantly, the video also shows other passengers' muted reaction to the bus's acceleration. At the time Grinnage lost his balance, the video in evidence shows three other standing individuals: (1) a passenger that boarded after Mr. Grinnage; (2) a woman in a red jacket holding a cup of coffee; and (3) a woman in a gray jacket. The passenger that boarded the bus after Mr. Grinnage is seen working out payment with both his hands and is standing totally unsupported. As the bus accelerates, this individual remains standing and makes no sudden movement, despite standing unsupported. The woman in the red jacket holding a cup of coffee is located in front of Mr. Grinnage and is leaning against a hip-level railing. She too makes no noticeable movement at the time of the incident, except maybe a sidelong glance toward Grinnage. Finally, the woman in gray can be seen holding the hip-

6

level rail with her right hand, and, like the other standing passengers, makes no remarkable movement during the bus's acceleration. Consistent with the experience of the standing passengers, the video shows that none of the seated passengers made any unusual movement when the bus accelerated.

SEPTA's surveillance video constitutes objective evidence of the incident. It fails to show a jerk or jolt of the bus that is so unusual or extraordinary as to be beyond Mr. Grinnage's—or anyone's—reasonable anticipation, or that the movement had an extraordinarily disturbing effect on other passengers. In fact, the video shows precisely the opposite.

Grinnage undercuts SEPTA's reliance on the video evidence, maintaining that it is "tainted" because the bus's speedometer was stuck on a number and does not accurately reflect the speed the bus was traveling at the time of the incident. He maintains that this lack of evidence of speed, coupled with his testimony, the bus driver's testimony, and the medical testimony, was sufficient to submit this case to the jury. However, this argument misses the mark.

First, and contrary to the trial court's conclusion, the malfunctioning of the video's speedometer does not render such evidence tainted. While cognizant that the speed is not captured, the video clearly shows the bus beginning to accelerate at the 8:47 mark, and Grinnage losing his balance at the 8:50 mark. During this three second lapse, it is unlikely that the SEPTA bus could have accelerated to a speed "so unusual and extraordinary as to be beyond a passenger's reasonable anticipation." However unlikely, we fortunately need not resort to speculation here, as the behavior of the other passengers—most notably the three standing ones—belies the trial court's contention that the lack of evidence of speed "prevent[ed] the court and the jury from conclusively agreeing with SEPTA that the movement was not excessive."

7/20/2023 Trial Ct. Op. at 2. Were the bus's movement so excessive that the speed of the bus was unusual, another passenger surely would have reacted. That evidence does not exist.

Moreover, Grinnage's testimony reflects that at the time of the incident he "ha[d] no idea" how fast the bus was moving. R.R. 247a. Likewise, the bus driver also testified that he did not know what speed he was going at the time of the incident.[3] *Id.* at 144a. Grinnage points to the trial court's conclusion that the bus driver's testimony was compromised on cross-examination as to speed and the movement of the bus. However, a fulsome evaluation of the bus driver's testimony does not show that it was compromised on cross-examination but rather demonstrates that the driver's recollection of the incident was actually consistent with the video evidence, *i.e.*, that no other passengers were unusually affected by the movement that caused Grinnage to lose his balance. When asked whether he saw a gentleman and a woman lurch forward at the same time that Grinnage lost his balance, the bus driver replied "[n]ot really." R.R. 137a. When further questioned about this same alleged movement, the bus driver reiterated his answer twice,

---

[3] The bus driver was also questioned at length about driving with one hand and a purported hard turn on the wheel while the bus was accelerating at the time of the incident. Considering the bus driver's testimony and the video evidence together, the trial court concludes:

> During examination, [the bus driver was] forced to admit that he was driving at times without his hands on the wheel and, immediately before [Mr. Grinnage] lost his balance, the driver is seen making a hard turn on the wheel, which jerked the bus into traffic while accelerating, a combination that showed numerous passengers beside [Mr. Grinnage] reacting on the video.

7/20/2023 Trial Ct. Op. at 2. While the bus driver can be seen steering the bus with one hand, there is no basis for the remainder of the trial court's conclusion in the record. Those observations were not supported by the video or testimony. In fact, the conclusion that there was a hard turn on the wheel to which numerous other passengers reacted is directly contradicted by the video evidence.

8

stating: "[n]o, it looked like he was standing there. He moved a little bit. I didn't see a jerk" and "[i]t didn't look like he moved forward to me. It looked like he was standing there moving back and forth." *Id.* at 138a. It is only after persistent questioning by Mr. Grinnage's attorney that the bus driver was ultimately forced to agree that both individuals moved forward at the same time in an involuntary movement. *Id.* at 140a-41a. However, as corroborated by the video evidence, any such movement was by no means "extraordinarily disturbing" to those passengers.

Grinnage cites this Court's decisions in *Buzzelli v. Port Authority of Allegheny County*, 674 A.2d 1186 (Pa. Cmwlth. 1996), and *Devlin v. Southeastern Pennsylvania Transportation Authority* (Pa. Cmwlth., No. 1076 C.D. 2015, filed February 24, 2016), 2016 WL 756939,[4] for the proposition that witness testimony of excessive speed is sufficient to warrant submission of a jerk and jolt case to a jury. However, jerk and jolt cases are highly factual inquiries, and neither case supports such a broad proposition.

In *Buzzelli*, this Court reversed a trial court's decision and allowed a new trial following a jury verdict for Port Authority in a passenger's action to recover damages sustained while riding a Port Authority bus. In that case, the passenger testified that at the time of her injury, the bus was likely traveling at 35-40 miles per hour when it suddenly stopped and the crush of other standing passengers who were thrown forward knocked her off her balance. Another witness confirmed this event, stating that "he bumped into others near him and almost everyone who was standing bumped into each other." *Buzzelli*, 674 A.2d at 1187. The bus driver testified, but could not recall the speed, or even the specific incident

---

[4] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, unreported opinions of this Court issued after January 15, 2008 may be cited for their persuasive value. 210 Pa. Code § 69.414(a).

9

leading to the passenger's injuries whatsoever. The trial court found that the passenger's evidence, if credited, may be sufficient to establish an unusual or extraordinary stop, citing the effect on other passengers. Notably, no video evidence of the incident was offered.

The other case upon which Grinnage relies, *Devlin*, is factually similar to the instant case. There, a passenger fell and sustained injuries after a bus accelerated and stopped while she was attempting to pay her fare. She testified that the bus accelerated "hard and fast" and explained her resultant ongoing medical injuries. *Devlin*, slip op. at 2-4. SEPTA entered video evidence of the incident, which showed that the movement of the bus had no extraordinarily disturbing effect on any other passenger. The trial court granted SEPTA's motion for summary judgment, finding that the passenger was unable to satisfy her burden under the jerk and jolt doctrine, and this Court affirmed. In so doing, this Court highlighted the video evidence of the incident and explained that there was no countervailing evidence of the bus's excessive speed or any other factors indicating that an extraordinary jerk or jolt beyond passenger's reasonable anticipation caused her injuries. Specifically, we stated:

> No matter whether she was knocked down by sudden acceleration or a sudden stop, it is not uncommon for a standing person on a bus to lose his or her balance if an ordinary or moderate jerk occurs. Although Devlin testified to the manner and extent of her injuries, neither injuries alone or, for that matter, the extent of her injuries, support an inference of an extraordinary or unusual jerk or jolt.

*Devlin*, slip op. at 9.

While Grinnage relies on *Buzzelli* and *Devlin* for the principle that countervailing evidence of speed is a question of fact for the jury to determine, we

10

cannot agree that such question was properly placed before the jury in this case. In *Buzzelli*, the passenger's injuries were actually caused by the falling of other passengers and is thus distinguishable from the instant matter. In *Devlin*, under strikingly analogous circumstances, the video evidence was conclusive that the passenger could not carry her burden of an extraordinary jerk or jolt. Accordingly, both *Buzzelli* and *Devlin* actually support this Court's conclusion.

Our holding is consistent with a long line of precedent applying the jerk and jolt doctrine. For example, in *Asbury v. Port Authority of Allegheny County*, 863 A.2d 84 (Pa. Cmwlth. 2004), a third-trimester pregnant plaintiff boarded a transit bus and fell when the bus accelerated while she was walking to her seat, resulting in a broken femur. Applying the jerk and jolt doctrine, the trial court concluded the plaintiff failed to present sufficient evidence of negligence as a matter of law, focusing on her failure to establish that the jerk or jolt of the bus had a disturbing effect on other passengers or that the nature of the accident inherently established the unusual movement of the bus. On appeal, we affirmed.

Similarly, in *Meussner v. Port Authority of Allegheny County*, 745 A.2d 719 (Pa. Cmwlth. 2000), a standing passenger was injured when he was preparing to exit a bus, and the bus came to a sudden stop. The passenger's wife also almost fell and testified that the bus stopped "real hard." *Id.* at 721. No other passengers were hurt. We noted that it is not unusual for standing passengers to lose their balance on a moving bus due to an ordinary or moderate jerk, and thus, affirmed the trial court's grant of non-suit.

Again, in *Jackson v. Port Authority of Allegheny County*, 17 A.3d 966 (Pa. Cmwlth. 2010), the plaintiff stood as a bus approached her stop and the bus driver "stomped on the brakes" causing the plaintiff to fall and break her kneecap.

11

*Id.* at 968. At arbitration, the plaintiff testified that she fell when the driver stomped on the brakes and clarified she also slipped on ketchup and water left on the floor by other passengers. The plaintiff's granddaughter testified that she was on the bus, but did not fall because she held onto a bar, and that other seated passengers were not injured or thrown from their seats. The arbitrator entered an award for the plaintiff, and we later reversed, holding that the jerk and jolt doctrine barred the plaintiff's claim as she failed to establish that the stop was so unusual or extraordinary as to be beyond a passenger's reasonable anticipation.

This precedent illustrates our previous statement in *Martin* that "the jerk and jolt test is difficult to meet." *Martin*, 52 A.3d at 390. Against the facts of this case, the trial court's entry of judgment in favor of Grinnage transforms the jerk and jolt doctrine from a "difficult [test] to meet" to one that assigns liability for even the most routine movements of a public transit bus. *Id.* Accordingly, we hold that the trial court erred as a matter of law, and the entry of a "a verdict for [Grinnage] was beyond peradventure." *Moure*, 604 A.2d at 1007. As such, we are required to reverse the trial court's entry of judgment and remand to the trial court to grant SEPTA's motion for post-trial relief requesting JNOV.

_____
MATTHEW S. WOLF, Judge

12

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Darnell Grinnage         :

                       :

        v.             :    No. 1046 C.D. 2023

                       :

Southeastern Pennsylvania   :

Transportation Authority and   :

John Doe/Jane Doe (SEPTA Driver) :

                       :

Appeal of: Southeastern Pennsylvania :

Transportation Authority     :

# **O R D E R**

AND NOW, this 8th day of August 2025, the Court of Common Pleas of Philadelphia County's (trial court) entry of judgment in favor of Darnell Grinnage in the amount of $121,921.97 is **REVERSED**.

This matter is **REMANDED** to the trial court to grant the Southeastern Pennsylvania Transportation Authority's motion for post-trial relief requesting judgment notwithstanding the verdict.

Jurisdiction relinquished.

 

 

_____

MATTHEW S. WOLF, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Darnell Grinnage           :
            :
        v.          :  No. 1046 C.D. 2023
            :  ARGUED:  December 9, 2024
            :
Southeastern Pennsylvania    :
Transportation Authority and    :
John Doe/Jane Doe (SEPTA Driver)  :
            :
Appeal of: Southeastern Pennsylvania  :
Transportation Authority      :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MATTHEW S. WOLF, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

**DISSENTING OPINION BY**
**SENIOR JUDGE LEADBETTER**          **FILED:  August 8, 2025**

Southeastern Pennsylvania Transportation Authority (SEPTA) appeals from an order of the Court of Common Pleas of Philadelphia County denying SEPTA's motion for post-trial relief requesting judgment notwithstanding the verdict (JNOV).  I disagree with the Majority's decision to reverse the trial court's order denying JNOV and, therefore, dissent.

This case pertains to the "jerk and jolt" doctrine, pursuant to which a bus passenger in a negligence action must establish that a jerk or jolt of the vehicle was so unusual or extraordinary as to be beyond a passenger's reasonable anticipation, *or* that the motion of the vehicle had an extraordinarily disturbing effect on other passengers.  *Connolly v. Phila. Transp. Co.*, 216 A.2d 60, 64 (Pa. 1966). (emphasis added).

The basic mechanics of how Darnell Grinnage came to be injured are not in dispute. In May 2019, he boarded a SEPTA bus carrying a newspaper in his right hand and his bus pass in his left hand. 6/21/2023 Hearing, Notes of Testimony (N.T.) at 29; Reproduced Record (R.R.) at 235a. After he swiped his bus pass, he proceeded to a seat and stood next to it while attempting to put his pass in his pocket. *Id*. at 30; R.R. at 234a. He knew that the bus would pull out but was taken aback when it did so because the passenger behind him was still in the process of paying the bus fare. *Id*. at 32; R.R. at 238a. Before Grinnage could sit down, the bus accelerated. As he lost his balance and started to fall backwards, he grabbed an overhead bar with his left hand to catch himself. He felt immediate sharp pain in his left arm as the bicep tendon ruptured. He described the movement of the bus when he lost his balance as follows: "A jerk was all I can – it was a forceful push or pull. It was forceful, enough to knock me down." 6/20/2023 Hearing, N.T. at 41-42; R.R. at 84a-85a.

Subsequently, Grinnage filed an April 2020 complaint against SEPTA seeking damages for his injuries. Following the close of discovery, the trial court denied SEPTA's motion for summary judgment wherein SEPTA asserted the "jerk and jolt" doctrine. At both the close of Grinnage's evidence and the close of the case, SEPTA moved for a directed verdict/entry of a non-suit essentially making the same argument. The trial court denied both motions. It also denied its motion for post-trial relief requesting JNOV, stating that it "must deny SEPTA's tread-worn and thrice rejected argument and conclude that the jury's verdict *is* supported by the evidence and cannot be overturned on post-trial motion." 7/20/2023 Trial Ct. Op. at 3-4 (emphasis in original). SEPTA's appeal followed.

In reviewing the denial of SEPTA's motion, there are two bases upon which a court may enter JNOV. The first

> is where a movant is entitled to judgment as a matter of law because, upon reviewing the record and deciding all factual inferences adverse to the movant, the law nonetheless requires a verdict in his favor. *Moure* [*v. Raeuchle*], 604 A.2d [1003,] 1007 [(Pa. 1992)]. The second is where "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Id.*[ ] In such a case, the court reviews the evidentiary record and concludes based on the evidence that a verdict for the movant was beyond peradventure. [*Id.*]

*Justice v. Lombardo*, 208 A.3d 1057, 1069 (Pa. 2019) (citation omitted). When "reviewing the lower court's decision, an appellate court must read the record in the light most favorable to the verdict winner and afford him the benefit of all reasonable inferences." *Menkowitz v. Peerless Publ'ns, Inc.*, 211 A.3d 797, 804 (Pa. 2019). "JNOV is an extreme remedy" which "may not be employed to invade the province of the jury." *Rohm & Haas Co. v. Cont'l Cas. Co.*, 732 A.2d 1236, 1248 (Pa. Super. 1999). Rather, "JNOV should only be entered in a clear case with any doubts resolved in favor of the verdict winner." *Menkowitz*, 211 A.3d at 804. In addition, our Supreme Court further explained that

> [a]n appellate court will reverse the trial court's decision to grant or deny JNOV only when it finds an abuse of discretion or an error of law. An abuse of discretion does not result from a mere error of judgment. An abuse of discretion exists where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record.

*Id*.

The Majority determined that the trial court erred in denying SEPTA's motion, focusing primarily on SEPTA's video depicting Grinnage and the other passengers and somewhat secondarily on the testimony. However, the video evidence was watched many times and from different camera angles by the jury as well as the trial court and in the context of the witnesses' respective testimony. An appellate court in reviewing the denial of JNOV must consider the entire record, reading it in the light most favorable to the verdict winner and affording him the benefit of all reasonable inferences. Considering the entire record, I do not believe that the JNOV standard has been met.

Turning first to SEPTA's video, I acknowledge the Majority's description of the contents but disagree with its interpretation. While it is true that the other passengers did not respond much to the bus's acceleration, the alternative element for applicability of the "jerk and jolt" doctrine—that there was a jerk or jolt of the vehicle so unusual or extraordinary as to be beyond a passenger's reasonable anticipation—came into play. Notably, the jury may have considered that the driver accelerated away from the stop even before the next passenger had paid, which would be unexpected, as well as driving with no hands on the wheel and then bringing the bus back under control "by jerking it to the left" at the same time as Grinnage fell. The jury may also have watched Grinnage and seen nothing that could have caused him to fall other than the unexpected acceleration of the bus.

This interpretation of the video is supported by the bus driver's admissions when he reviewed the video. The bus driver admitted on cross-examination that he accelerated before the bus doors closed and before the male passenger who boarded after Grinnage paid the fare or crossed over the yellow line. 6/20/2023 Hearing, N.T. at 89 and 93; R.R. at 132a and 136a. In other words, the

BBL - 4

next passenger was standing in the doorway when the bus accelerated. *Id*. at 93; R.R. at 136a. In addition, the bus driver admitted that he was operating the bus with one hand and at one point took both hands off the wheel. *Id*. at 98-100; R.R. at 141a-43a. Further, the bus driver answered "yes" to the following question: "Do you see that you let your hand off the wheel, and then bring it back under your control by jerking it to the left at the same time that Mr. Grinnage, this woman here and this gentleman all had forceful movements, correct?" *Id*. at 100; R.R. at 143a. Consequently, the bus driver was "forced to admit that he was driving at times without his hands on the wheel and, immediately before [Grinnage] lost his balance, the driver is seen making a hard turn to the wheel which jerked the bus into traffic while accelerating [.]" 7/20/2023 Trial Ct. Op. at 2.

Moreover, Grinnage presented the testimony of board-certified orthopedic surgeon Dr. Jack Shilling. After reviewing Grinnage's medical records and the video, Dr. Shilling opined that the incident caused Grinnage to sustain a left distal bicep tendon rupture due to the forceful, sudden, and significant movement of the bus. Dr. Shilling testified that what causes a bicep tendon to rupture is "typically, a forced extension across a flexed bicep, so an eccentric contraction of that muscle." 11/30/2022 Dep. of Jack W. Shilling, M.D., N.T. at 31; R.R. at 390a. He stated that the mechanism is "[w]here the muscle is trying to pull the arm forward but a separate force pulls the arm to extension against the flexed muscle, and ultimately, the force of extension overcomes the tendon's ability to maintain its insertion on the bone." *Id*. at 31-32; R.R. at 390a-91a. His testimony describing the video was as follows:

> I saw a gentleman on a bus walking down the walkway between the seats. He turned, was preparing to sit, paused. The bus moved forward. He fell backward. Reached up with his left arm to the support pole above, and in the process of doing that, as the bus began to move, his arm

was pulled into extension.  He then sat/fell into his seat and immediately grabbed his left elbow.

*Id*. at 36; R.R. at 395a.  Dr. Shilling opined, within a reasonable degree of medical certainty, that the incident resulted in the left distal bicep tendon rupture.  *Id*. at 37; R.R. at 396a.  Specifically, he testified that when the bicep tendon was ruptured:

It was a forceful movement against a flexed arm. [Grinnage] was supporting his weight – trying to support his weight through his flexed arm, and the force of the bus moving forward, as he was moving backwards, overcame what his bicep was able to hold.

*Id*.  In describing the type of extension force being applied, Dr. Shilling testified: "It appeared to be sudden and significant.  I mean, [Grinnage] jerked and was unable to hold himself up."  *Id*.

Medical evidence of a forceful injury, in and of itself, generally is insufficient to establish an extraordinary jerk or jolt.  *Jackson v. Port Auth. of Allegheny Cnty.*, 17 A.3d 966, 970 (Pa. Cmwlth. 2011); *Asbury v. Port Auth. of Allegheny Cnty.*, 863 A.2d 84, 89 (Pa. Cmwlth. 2004).  To prove that a fall was "so violent and unusual as to permit the jury to predicate on it alone a finding that the jerk was extraordinary and unusual - requires more than losing one's balance while standing or walking in the bus."  *Jackson*, 17 A.3d at 970.  However, I agree with Grinnage that Dr. Shilling's testimony, *in combination with the other evidence*, constituted additional evidence that a jury could consider in determining whether there was an unusual or extraordinary jerk.

As for any suggestion that the verdict is against the weight of the evidence or that the "jerk and jolt" doctrine does not apply because the jury found Grinnage to be 45% negligent, the trial court stated:

> To the contrary, the court sees the jury as thoughtfully sifting through the evidence, considering the video [as well as] considering the testimony to determine what version it deemed more credible and then dividing liability between the parties. Viewing the record in its entirety (and having watched the video played over and over, as did the jury), this court cannot say conclusively that a clear case of unextraordinary jerk and jolt is displayed in the video.

7/20/2023 Trial Ct. Op. at 3. In other words, the trial court found that the nature of the verdict reflected the jury's determination that Grinnage might have avoided injury had he either promptly found a seat or held on to the bar while standing. 10/11/2023 Trial Ct. Op. at 2. Accordingly, the trial court concluded that the jury properly rejected the sole cause of Grinnage's loss of balance as the type of operational movement to be expected from a bus making frequent stops and starts. In addition, the trial court determined that "the interpretation of the video to determine contribution of the acceleration in conjunction with a sharp turn of the wheel on this inconclusive video was an issue for the factfinder." 7/20/2023 Trial Ct. Op. at 3.

I agree with the trial court's analysis. Ultimately, the jury divided liability between Grinnage and SEPTA and I believe we must defer to its factual finding on the issue. It is not the province of this Court to substitute our view of the evidence for that of the jury. Accordingly, I believe that the Majority in its appellate capacity improperly reversed the trial court's order denying JNOV and I would affirm the judgment entered.


_____
**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita


BBL - 7